# COMMONWEALTH OF MASSACHUSETTS

**ESSEX, SS.**

**SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT**

2677CV000360D

|  |
|---|
| JANE DOE |
| Plaintiff |
| v. |
| JOHN DOE |
| Defendant |

Civil Action No. _____

FILED
ESSEX SUPERIOR COURT
2026 FEB 26 A 2: 17

## COMPLAINT AND JURY DEMAND

### INTRODUCTION

1.       Plaintiff Jane Doe ("Plaintiff") is the mother of Defendant John Doe

("Defendant").  Since Defendant's young adulthood, he has suffered from serious and severe

mental illness, including Bipolar Disorder, Psychosis, and Substance Use Disorder. For years,

Plaintiff tried to help her son obtain professional mental health and medical treatment, but he has

refused to do so, irrationally denying the safety of Western medicine and buying into conspiracy

theories about such treatments. Rather than accept help, Defendant has opted instead to use and

self-medicate excessively with marijuana and psychedelic drugs. He has done so for years,

spending vast amounts of money.

2.       Defendant also suffers from a persistent gambling addiction. Over the years,

Defendant has gambled away nearly all of the money his mother, and later a Trust, have given

him to live, and in more recent years to help support his family. Defendant has made his

1

interactions with his mother nearly exclusively about his efforts to get money from her. Over the years, Defendant has employed a variety of strategies to get money from his mother. For example, Defendant would bargain with his mother by offering that he would accept treatment in exchange for her paying him to do so.

3.      Plaintiff has watched her son's mental health deteriorate over the years, leading not only to his embrace of conspiracy theories about medicine, but also to his belief in aliens, his belief that he has cancer, and his belief that the government is actively conspiring to poison society. She has seen his functioning dwindle to the point of joblessness, occasional homelessness, discord with landlords, financial exploitation by associates, medical and mental health self-neglect, refusal of treatment, spousal abuse and legal disputes.

4.      Despite all these difficulties, Plaintiff has long refused to give up on her son.

5.      More recently, however, Defendant has crossed a line from demanding money and bargaining into outright extortion. Defendant has made threats against his mother demanding that he pay her money or face serious consequences if she refuses. Defendant has threatened his mother with both civil and criminal liability based upon Defendant's false, defamatory and manufactured claim that his mother sexually abused him decades ago when he was between the ages of 4 and 7.  Defendant claims falsely that he only recently "recovered" his memory of the alleged abuse in 2024. Defendant has already published his false, defamatory and extortionate claims to third party family members and others. Defendant now threatens his mother that, if she does not pay him millions of dollars, he will publicize his claims still further, including in threatened court proceedings.

6.      Defendant has crossed a line. His claims are outrageous, demonstrably false, and constitute extortion. Despite her care for her son, Plaintiff will not give in to Defendant's

extortionate threats. Instead, she hopes this legal forum will permit her to help her son grapple with the severe consequences of his actions.

## PARTIES

7.      Plaintiff Jane Doe is the biological mother of Defendant John Doe. Plaintiff resides in Salem, Essex County, Massachusetts.

8.      Defendant John Doe is the biological son of Plaintiff Jane Doe. He resides in Las Vegas, Clark County, State of Nevada.

## JURISDICTION AND VENUE

9.      This Court has personal jurisdiction over Defendant because Defendant committed tortious acts within the Commonwealth of Massachusetts and/or expressly directed tortious conduct toward Plaintiff in Massachusetts which has caused her injury in the Commonwealth.

10.     Venue is proper because a substantial part of the events giving rise to the claims occurred in Essex County.

## FACTS

**A. Defendant's Early Childhood**

11.     Defendant was born on December 8, 1988, to Plaintiff and Paul B. ("Paul").

12.     Defendant grew up with his parents and younger brother Eric B. and enjoyed a healthy and happy childhood.

13.     Defendant did well in school, attended summer camps, participated in extracurricular activities, and was a well-liked and sociable child who thrived with the love and support of his family, friends, teachers and coaches.

14.     Due to irreconcilable differences and a breakdown in their marriage, Plaintiff and Paul separated in 2001.

15.     Plaintiff and Paul were separated for approximately 10 weeks.

16.     In 2001, Paul took his life by suicide. Defendant was 12 years old. Naturally, this devastated and traumatized the entire family.

17.     In 2006, Plaintiff married Jeffrey G. ("Jeff"), to whom she remains married.

18.     Plaintiff did everything she could to protect her children's mental health following the tragedy of Paul's death, including providing them with a stable home and school setting, and offering access to talk therapy with mental health professionals. Anytime Defendant expressed a desire to quit therapy, Plaintiff respected her son's decision and Defendant discontinued treatment.

19.     As a minor, Defendant was placed on a very brief trial of stimulants for ADHD by his pediatrician. The trial lasted about 10-14 days. When Defendant told his mother he did not want to take this medicine anymore, he stopped. Defendant did not take any other psychiatric medication growing up.

20.     In 1991, Plaintiff and Paul created a Minor's Trusts IRC2503(c ) for each of their children to save for the future – especially education, health and financial security.

21.     On or about June 28, 2000, when Defendant was 11 years old, Plaintiff and Paul updated the Defendant J. Doe 2000 Irrevocable Trust (the "Trust") for the benefit of their son Defendant. They did the same for their younger son, Eric. The Trust, within the discretion of an appointed trustee, was designed to distribute monetary funds for the health, education, reasonable comfort, best interest and welfare of Defendant and his future children, to permit Defendant to enter into or engage in a business or profession which the trustee believes has a

reasonable prospect for success and/or to permit Defendant to make a reasonable down payment on a personal residence.

22.     The Trust documents contemplated that when Defendant reaches the age of 35 or more years, fifty percent (50%) of the remaining principal of the Trust shall be given to Defendant upon his request. Defendant would then be entitled to request part or all of the remaining principal of the Trust once he turned 40 years of age.

**B.  Defendant's Adolescence into Young Adulthood (approx. 2001-2011)**

23.     Before his father's death in 2001, Defendant grew up surrounded by family and friends and enjoyed a stable and happy childhood. There were no indications of significant behavioral issues. He did have ADHD and a Nonverbal Learning Disorder, the latter diagnosed in August 2003, for which he received some Chapter 504 accommodations in high school. Defendant did not have an educational or police disciplinary record.

24.     After the tragic loss of his father, in high school Defendant began isolating and smoking cannabis in secret. He also developed a strong interest in poker, first with friends and then online. Defendant used an adult's credit card to compete in professional poker tournaments on the internet. When Plaintiff found out, she began to monitor the family computer and installed parental control software. She installed a cutoff timer on the home internet server to prevent Defendant from playing at night.

25.     Unbeknownst to Plaintiff at the time, Defendant had purchased a laptop to play poker at night in secret, until Plaintiff found out. After that she took it away each night, only letting him use it for schoolwork during the daytime.

26.     Notwithstanding these issues, Defendant did well in school and graduated from Marblehead High School in 2007. He was accepted into all six universities he applied to and

received offers of merit-based scholarships from several of them. Defendant chose to attend Bentley College with the intention of studying Finance.

27.     Defendant's education was going to be fully paid for by his mother; however, Defendant completed only one semester at Bentley. After being kicked out of the dorms for cannabis-related activities, he decided to drop out and begin a career as a professional poker player.

28.     Between 2008-2012, Defendant lived in over 13 different locations in the U.S. and abroad, including the Philippines, Uruguay, California, Colorado, Nevada, Massachusetts, Washington, and Pennsylvania, playing professional poker and attempting to start his own cannabis growing business.

29.     Throughout these years and onwards, Defendant developed a heavy dependence on marijuana and would regularly use a highly potent form of cannabis concentrate called "shatter," which boasts a very high THC content that is two to three times stronger than traditional cannabis flower. Defendant also began chronically abusing psychedelic substances containing psilocybin.

30.     Defendant was initially quite successful as an online poker player and had placed 299th in the World Series of Poker at the age of 21. For the most part, he was able to support himself fully as a poker player until approximately mid-2011.

31.     Defendant did not maintain proper financial records while playing poker and, as a result, was audited by the Massachusetts Department of Revenue ("MA DOR") in 2009 for his 2008 tax returns. Defendant ignored this issue for approximately nine (9) months and refused to reply to the MA DOR.  After repeated efforts and support by Plaintiff, Defendant agreed to give

Power of Attorney to a Massachusetts accountant to work out a settlement on his behalf. This accountant was also paid for by Plaintiff.

32.     MA DOR assessed that Defendant owed the state $24,648.00 due by December 16, 2013. Although he had over three years to do so, Defendant refused to pay this amount. Plaintiff ultimately paid this amount on Defendant behalf to protect him from any further tax violations.

33.     While living in Boulder, Colorado, Defendant pled guilty to a charge of Driving While Ability Impaired (DWAI) in 2011. After being sentenced to pay a small fine and 24 months of community service, Defendant failed to appear at a court hearing and fled the country for the Philippines, refusing accountability for his actions.


C.  **Defendant's Adulthood (approx. 2012-2022)**

34.     From 2011 through 2012, Defendant flew to and from the Philippines multiple times to play poker and continue attempts at cannabis cultivation. In early 2011, he missed two flights to the U.S., overstayed his visa, and ran out of funds. Plaintiff wired money for Defendant's requested ticket back.

35.     In mid-2012, Defendant and his girlfriend moved together to the Philippines, but their stay was characterized by heavy drug use and the two quickly ran out of money, their cannabis business never materializing. Defendant's girlfriend was hospitalized with a reported psychotic break; her father had to fly out to bring her back to the U.S.

36.     In addition to the Trust set up by his parents, Defendant was also to inherit approximately $100,000 from his paternal grandmother. His paternal aunt was the Trustee. She

gave him the money in increments, but Defendant quickly burned through the money each time, gambling and unsuccessfully attempting to grow cannabis.

37.     By the end of 2012, Defendant's younger brother, Eric, wrote Defendant a letter telling him he no longer wanted a relationship due to Defendant's chronic drug abuse, mishandling of finances, conspiratorial beliefs, and exploitation of those close to him.

38.     In early 2013, Defendant lived in Colorado in at least two different locations. By March of that year, he moved to San Diego, California, where Plaintiff helped him secure an apartment and agreed to serve as the guarantor for the 12-month lease. Defendant broke the lease in under 2 months, insisting on going to Uruguay for a second attempt at a cannabis growing business.

39.     Desperate to help her son find stability, Plaintiff agreed to give Defendant $10,000 for his business venture if he agreed to a 2-week inpatient psychiatric evaluation upon return. Defendant emailed his mother to say that he agreed to this arrangement.

40.     Defendant spent about one month in Uruguay with his girlfriend. He quickly ran out of the money that Plaintiff gave him, and returned to the U.S., refusing the agreed-to psychiatric evaluation.

41.     Defendant and his girlfriend spent July through October 2013 living a nomadic existence in Washington state. He befriended strangers who threatened him and threw him out of their home. He purchased a previously stolen trailer that he abandoned mountainside at the onset of snow. Defendant ultimately fled Washington under duress, having associated with dangerous and threatening individuals looking to take advantage of him.

42.     Because of his heavy drug use throughout this time, instead of money, Plaintiff sent Defendant warm clothing, shoes, and gift cards to purchase food.

43.    Defendant's mental health and behavior continued to deteriorate.

44.    By November of 2013, Defendant and his girlfriend began staying at her parent's condo in Tucson, Arizona. Despite initially welcoming his mother and stepfather for a birthday visit, one day later he declared that he was renouncing them and his entire family.

45.    By the end of 2013, Defendant was threatening his aunt for the rest of his $100,000 inheritance from his grandmother's trust.  Specifically, Defendant told his aunt in an email exchange dated December 4, 2013, to **"[d]o the right thing…or you're going to get yours soon enough anyways."** Defendant gave his aunt an ultimatum, suggesting that this process **"can truly be a like a 'checkup' or it can be like pulling teeth-you decide the level of excruciation."**[1]

46.    By December 8, 2013, after incessant harassment and nasty comments about his grandparents to her, Defendant's aunt gave up and wired Defendant the remainder of the money. She told him not to contact her anymore. Defendant spent the rest of this inheritance largely on drugs and poker.

47.    In the beginning of 2014, Defendant and his girlfriend broke up for good. He began to associate with and give money to conspiracy theorist Jordan Maxwell in California. Defendant also spent significant time on Facebook posting conspiracy theories and touting marijuana as a panacea.

48.    2014 marked the beginning of a series of hospitalizations for Defendant.

49.    In May 2014, when Defendant's emails started to take on an increasingly dangerous tone and after consultation with psychiatrists, Plaintiff flew to California from Massachusetts to try to see and help Defendant. Before he knew Plaintiff had come, Defendant

---

[1] All grammatical and typographical errors are in the original.

emailed a hostile and suicidal threat. Then Plaintiff called the police asking for a mental health team to be sent to evaluate Defendant. The Los Angeles Police Department brought him to the police station for a screening and then to Community Hospital Long Beach ("CHLB") where he was admitted on an involuntary basis. This was the first of three (3) inpatient psychiatric hospitalizations.

50.    During his three-day stay at CHLB, based on hospital records, Defendant reported a history of Candida infection, stomach cancer and skin cancer, all of which he self-diagnosed. He perseverated about conspiracy theories and expressed paranoid delusions. He told doctors that he had stomach cancer, was dying and needed marijuana for treatment. He reported smoking marijuana daily, multiple times a day.

51.    His psychiatrist, Dr. Azad Kurkjian thought that Defendant's heavy marijuana use was likely perpetuating psychosis.

52.    Defendant's records from CHLB note that he admitted to thinking about a suicide pact with his girlfriend in which they would kill each other because he was upset that she would not move to Uruguay with him.

53.    The team at CHLB considered Defendant's insight and judgment to be extremely poor. In fact, Dr. Kurkjian wrote in his psychiatric evaluation: "I am very concerned about not only his safety but public safety.  The patient in this manic state may go do something to harm others, even though he is saying he is not going to.  He is very manic and euphoric and elevated in his presentation, and I feel that he is capable of doing anything."

54.    Despite these concerns, Defendant was allowed to discharge from CHLB against medical advice, refusing all recommended medications. Plaintiff and Jeff had remained on the ground in California the entire time, but Defendant refused to see or speak to them.  At

discharge, Defendant was assigned a Department of Mental Health case worker, but he refused all services.

55.     Soon after, Defendant again attempted to bargain for money in exchange for psychiatric treatment, communicating with his mother only via his step-uncle. Plaintiff tried to make it clear that she would not agree to pay Defendant a large sum of money in exchange for simply marking time in a facility, and that he needed to seriously engage and cooperate in active treatment before she would agree to help him financially. Plaintiff never agreed to pay Defendant any specific amount of money in exchange for simply seeking treatment.

56.     In June 2014, Plaintiff learned through family that Defendant had been left in a strange home with an unknown man, and that he felt very unsafe. Plaintiff became even more worried about her son's safety and well-being. With encouragement from his step-aunt and uncle, Defendant finally spoke with Plaintiff and agreed to a two-week voluntary hospitalization at the Menninger Clinic in Houston, Texas. Plaintiff arranged hotel, flight and transport, along with an eventual payment of $29,400 to Menninger for the cost of Defendant's treatment.

57.     Defendant's records from The Menninger Clinic note Defendant reported that his mother "agreed to pay him $2500 a week if he went to Menninger" and that "there was an apparent negotiation between patient and his mother that he would obtain $250,000 after he finished treatment." There is yet another reference to a non-existent monetary deal in which Defendant reported that his mother would pay him $20,000 to $25,000 per week if he would agree to a rehabilitation program at Menninger. The records also document "[my] mother wanted me to be in for the past 3 years. She doesn't like my lifestyle of daily cannabis use...since I was 14."

58.    Defendant's records from Menninger between June 20, 2014 and July 3, 2014, and signed by attending physician W. Blake Haren, MD, indicate admission diagnoses of Bipolar I, most recent episode Manic, severe with psychotic features; Cannabis Dependence (provisional); with possible Cannabis-induced Psychotic Disorder with delusions. Defendant was "positive for grandiose delusions, paranoia, persecutory delusions, as well as racing thoughts." He also was found to have poor nutritional status, occupational problems (unemployment), and very low functioning.

59.    Defendant reported a history of illicit drug use including LSD, mushrooms, ecstasy and smoking marijuana daily. He had recent episodes of vomiting and abdominal pain, diffuse with multiple characteristics "like razor blades," sharp and cramping. Defendant ingested Bentonite clay a couple of days prior to admission, allegedly to cleanse himself. Defendant was also diagnosed with severe Vitamin B12 deficiency for which he refused B12 injections.

60.    As part of his reported family history, Defendant told his doctors "my dad's dad had molested him, and I guess he wanted kids so he could do the father thing right." He also reported that in high school he started smoking marijuana and playing poker "behind mom's back." Defendant told staff that "[h]e is here only as a result of what he believes is a bargain with his mother to get an enormous sum of money if he admitted."

61.    Diana Friedland, LICSW at Menninger noted that Defendant was "'unreliable' and much of his account of his life and rationale for his behavior is very suspect."

62.    Defendant's unusual behaviors and comments, observed by Menninger staff included: "[p]atient was selling reading material to other peers on the unit that depicted 'arise of the fourth reich' noting a subversive/conspiratorial not see [sic] conspiracy that was allegedly

active in the United States." In addition, Defendant is noted to have said that "cannabis is the perfect drug. It will cure anything. Including my stomach cancer."[2]

63.    On July 3, 2014, because of medication non-compliance, disruptive behaviors on a voluntary unit, and ongoing suicidal ideation, Menninger transferred Defendant to Houston Methodist Hospital ("HMH") for an involuntarily admission in hopes of clearing his psychosis while off cannabis and with a trial of medication. Menninger's discharge diagnosis was Bipolar I Disorder, most recent episode Mixed, Severe with psychotic features.

64.    In the application for emergency detention, Defendant was noted to have an "inability to discern reality due to delusional thought processes." The History and Physical notes from HMH, document that "[t]he patient denied any kind of abuse, whether…physical, sexual, or mental."

65.    HMH records state that on July 8, 2014 Defendant "disclosed he has written a letter to his mother outlining terms for his stay in rehab and her funding him. He disclosed sense of ultimatum in the email he had written to his mother; insists he does not need her in his life if she does not accept his terms." The next day, he reported "He says he is 'done' with his mother b/c she violated every single term of their agreement."[3]

66.    His HMH records further note "[i]t is unclear yet whether his beliefs rise to the level of delusions or represent a more chronic picture, e.g. schizotypal disorder."

67.    At HMH, Defendant was diagnosed with: Bipolar I Disorder; Cannabis Dependence, Hallucinogen Abuse; Posttraumatic Stress Disorder; Esophageal Reflux and Gastritis/Gastroduodenitis. There was evidence of continuing suicidal ideation.

---

[2] All grammatical and typographical errors are in the original.
[3] All grammatical and typographical errors are in the original.

68.    On July 9, 2014, at an initial court hearing, Defendant contested his ongoing hospitalization. Because HMH failed to provide a second required signature, Defendant was discharged with an order to return for a medication commitment hearing on Monday, July 14, 2014. However, Dr. Mihaela Ivan of HMH who attended the second hearing, wrote that Defendant did not appear alongside his attorneys. Defendant had already left Texas for California by bus, raising money for a ticket via GoFundMe. For Defendant's short stay at HMH, Plaintiff paid over $9,900.

69.    From July through September 2014, Defendant did not disclose his whereabouts to Plaintiff, but she eventually learned that he'd been staying with various friends in Los Angeles. Plaintiff began to send Defendant Whole Foods gift cards to ensure he was able to feed himself.

70.    On August 11, 2014, due to Defendant's continued erratic, self-neglectful and self-destructive behaviors, the Trustee and Plaintiff filed a Petition to Reform the Defendant's Irrevocable Trust, seeking to modify the Trust to provide for Defendant's long-term safety and welfare rather than risk Defendant completely depleting the Trust upon turning 35 and 40 years old. At this time, Defendant received a full picture of the nature and size of the Trust.

71.    The court denied Plaintiff's motion for an independent medical examination and eventually dismissed the Petition to Reform in 2016 on grounds that her claim was not yet ripe. In response to a Motion for Clarification regarding the issue of ripeness, the court reasoned that Defendant was only 26 years old, had not been under guardianship or proven he had a disability, and that he had until 35 years old to essentially try and clean up his act.

14

72. From September through October 2014 Defendant was in Johannesburg, South Africa living with a female love interest. He continued to abuse marijuana and psychedelic drugs.

73. In October 2014, the father of the female love interest paid for Defendant's return flight to the United States. He then stayed at a friend's house in Sherman Oaks, California, growing marijuana. He continued to ask Plaintiff for cash.

74. From November 2014 through February 2015, Plaintiff helped her son financially by sending him $500/week from her own personal resources.

75. Defendant set up a holistic counseling page on Facebook with Stephanie Lloyd ("Ms. Lloyd"), a woman he met online living in the United Kingdom. Their page promoted use of both cannabis and MDMA/ecstasy (a stimulant and hallucinogen) as treatments for cancer.

76. At this time, Defendant was 26 years old and was required to obtain his own healthcare coverage separate from his mother. Due to his conspiratorial thinking around Western medicine, Defendant refused to sign up for health insurance, despite Plaintiff's offer to pay for it.

77. By the end of February 2015, Defendant began to communicate with the Trustee to request funds from the Trust to support his lifestyle and travel.

78. In April 2015, Defendant flew to England to live with his Facebook girlfriend, Ms. Lloyd. Defendant was detained at the airport and flown back to the United States. He called his mother collect for the first time in eight months from JFK airport. As Defendant had no cash, he asked for financial assistance to get to California. Plaintiff gave Defendant money for a plane ticket and a hotel through the weekend only.

79. Defendant spent April 2015 living in a hotel in California before attempting to fly to England again. He was detained a second time and was deported after four days.

80.   Defendant spent the next five months travelling with Ms. Lloyd to the Netherlands, Uruguay, Spain, and England. In Amsterdam, after Defendant claimed he was vomiting blood but refusing to seek medical assistance, Plaintiff was able to request a wellness check with the assistance of the State Department.  Defendant then fled the country with Ms. Lloyd and refused to contact his family.

81.   Defendant eventually returned to the United State alone with a ticket paid by for by the Trustee and began a GoFundMe to raise money to fly Ms. Lloyd and her 16-year-old son to the U.S., with plans for her to leave England permanently.

82.   The Trust refused to assist with Ms. Lloyd and her son's move; however the Trust was now fully funding Defendant's livelihood, paying his security deposit and first month's rent on a larger apartment, in addition to a regular weekly allowance of $1,100. Defendant refused to share that address with the Trustee.

83.   When Defendant asked for increased distributions, the Trustee refused. Defendant grew impatient and angry at the Trustee, becoming verbally abusive, with hateful rhetoric aimed at both the Trustee and his mother for the lack of additional funds.

84.   Defendant continued to make public statements on his Facebook page that he was dying of cancer, even while refusing reasonable medical care. He again refused contact with his mother.

85.   In March, 2016, Ms. Lloyd and her oldest teenage son travelled to the U.S. She and Defendant got married in Las Vegas, NV in April 2016. Defendant again asked the Trust and then Plaintiff for more money.

86.   After two earlier miscarriages, Defendant fathered three children with Ms. Lloyd between 2018 and 2022. Defendant claimed that he did not believe in birth control.

87.     In 2017, to prevent Defendant from misusing funds, the Trustee began to pay his rent in full, directly to the landlord. The Trustee also provided a weekly cash allowance of approximately $900-$1,000 and paid for health insurance for Defendant, Ms. Lloyd, and their children.

88.     The Trust covered other expenses for Defendant and his family, such as moving costs, toys, books, food, and at-home birthing services for Ms. Lloyd.

89.     Defendant and Ms. Lloyd lived in Las Vegas Nevada during those years, relying almost entirely on the money from the Trust, as well as gifts and aid from Plaintiff and Jeff.

90.     Defendant regularly ran out of funds gambling and buying drugs, providing Ms. Lloyd with scant money to survive and care for herself, her teenage son, and the three young children she eventually had with Defendant.

91.     Ms. Lloyd and Defendant's relationship was extremely unstable, characterized by Defendant's verbal and emotional abuse, financial coercion and infidelity. The couple separated and reunited several times.

92.     Between 2016 and 2024, Defendant would only communicate with his mother to request money, threatening her ability to visit with her grandchildren unless she helped him financially. Only once during the many visits Plaintiff and Jeff made to see Ms. Lloyd and their grandchildren in Nevada did Defendant agree to in-person contact, largely because he was angry with Plaintiff for refusing to give him money in exchange for marking time in treatment, and angry at her hope and occasional pleas that the family might receive routine medical care and/or case management services. Defendant continued to battle with various Trustees for more money and was perpetually unemployed. In 2024 the Trustee found evidence that Defendant had

repeatedly used large sums of grocery money from the Trust during the previous year to buy supermarket gift cards that he sold for cash.

93.    Eventually, Defendant and Ms. Lloyd's relationship broke down, and the couple divorced for good in 2022.

94.    During their tumultuous relationship, Defendant withdrew his support for Ms. Lloyd's application for Legal Permanent Resident status ("green card"), despite her being pregnant with his first child.

95.    Ms. Lloyd ultimately secured her status with the help of a legal service attorney, self-petitioning under the Violence Against Women Act (VAWA) based on Defendant's abusive behaviors.

96.    Upon separation and later divorce, with Ms. Lloyd having primary physical custody, Defendant moved into a three-bedroom apartment paid for by the Trust, claiming he needed the additional space for his children's visits. Instead, Defendant rented out these extra rooms to strangers for drug and gambling money, putting his children at added risk when they visited.

97.    Defendant has a long history of owing money to various people who would stake him in poker.  These debts have further exacerbated Defendant's desperation for money and his willingness to do and say just about anything to get it.

**D.  Civil Coercion**

98.    Contrary to Defendant's recent claim that he somehow in 2024 "recovered" memories of his mother supposedly sexually abusing him as a young child, Defendant on June 3, 2016 emailed Plaintiff asking for money making the same false and cruel allegations eight years earlier.

99.    The subject line of his June 3, 2016 email was "**mom I know you molested me.**" The body of the email read as follows: "**Look...I just remembered fully whats happened and I've put all the pieces together...The only way you can redeem yourself is to give me all your money and kill yourself..**" [4]

100.    Despite Defendant claiming that he knows "fully whats happened" he continued communicating with his mother, sending a combination of threatening emails peppered with requests for monetary assistance and requests for forgiveness.

101.    On April 10, 2018, Defendant emailed Plaintiff again making similar allegations, specifically saying "**I also don't appreciate that you molested me as a child and then blamed Paul...you truly are insane.**"

**102.**    In an email sent on December 17, 2018, from Defendant to Plaintiff and his maternal grandparents, he expressed an interest in resolving their family issues. Specifically, Defendant emailed Plaintiff the following: "**I do love you and want a relationship with you, I just don´t want to be told what to do.**"

103.    Defendant emailed his mother on May 1, 2019, with a string of emails and threats after believing Plaintiff was pushing vaccinations on his children. The emails read as follows[5]:

a.    Wed, May 1, 2019 at 1:26 AM:

"**Plaintiff you are not allowed to be involved with my children if you are going to push vaccines and pharmaceuticals..... Stop all of this bullshit right now or I swear I will do everything in my power to prevent you from ever seeing Jordan or Leo if you push this issue anymore**"

---

[4] All grammatical and typographical errors are in the original.
[5] All grammatical and typographical errors are in the original.

b. Wed, May 1, 2019 at 1:30 AM:

"**you are immoral trash and have extremely bad things coming to you... no wonder you can´t sleep at night!**"

c. Wed, May 1, 2019 at 1:31:

"**its your conscience torturing you.......... you dont deserve to be a grandma anyways you are terrible mother I´m lucky to be alive - no thanks to you cunt**"

d. On Wed, May 1, 2019 at 1:32 AM:

"**you are going to get extremely sick, suffer tremendously, have no support from anyone around you because no one actually cares about you, go completely mentally ill, and die a painful death have fun with that bitch**"

e. On Wednesday May 1, 2019 at 4:33 AM:

"**I want to be 100% clear you are not going to have my children poisoned with heavy metals, viruses and other toxic crap.... keep your mental illness to yourself and die**

**thanks**"

104.    On June 6, 2021, Defendant emailed Plaintiff requesting to talk, wishing her a happy birthday and specifically saying, "**[w]hat I think we need to do is reestablish a healthy relationship as a mother and son and to show Jordan and Leo that we are a proper family.**"

105.    Despite the ongoing, documented and full financial support of both Plaintiff and the Trust, on November 17, 2021, Defendant emailed Plaintiff and Jeff the following:

> **"Realistically you have more money than you could ever use in your lifetime and withholding your support from me has only created resentment towards you.  You need to help me as your son and as a dad if you want me to change my mentality towards you."**

106.    On April 16, 2023, Defendant emailed his mother and maternal grandmother the following:

> **"Hi Barbara and [Plaintiff] I wanted to see how you both were doing.  I also wanted to ask you an honest question and maybe it's not one you want to hear but whatever.  Are you guys including me in your wills?  Please don't cut me out.. I have 3 children and I appreciate you aren't willing to help me while you are alive but please don't leave me and my children high and dry"**

107.    On July 24, 2024, the Trustee at the time, Fleming & Curti PLC, notified Defendant via letter that the current rate of spending was no longer sustainable, and that as of September 2024, the Trust would make significant reductions to his distributions. The letter encouraged Defendant to support himself and his family.

108.    Following this notice from the Trustee, Defendant began to get desperate and angry at the thought that his fully paid lifestyle may be jeopardy.

109.    On October 25, 2024, Defendant, through his attorney, filed a Petition in Clark County Nevada District Court (the "Petition[6]"), where Defendant was living and the Trust is used, seeking to assume jurisdiction of the Trust in Nevada, appoint an alternative Trustee,

---

[6] Petition to Assume Jurisdiction of Trust, for Removal of Trustee and Appointment of Alternative Trustee and Petition to Compel Disbursements of Trust Assets and Appointment and Payment of Counsel.

compel distribution of Trust assets, and appoint and pay his counsel. The Petition did not acknowledge the rights of his three children as beneficiaries. (District Court Clark County Nevada Case No. P-24-122898-T).

110.    The Petition alleges that both Fleming & Curti and Dunham Trust Company, through "the continued control and 'exercise of discretion' by the Trustees after December 8, 2023, is a de facto imposition of a guardianship directed by the Settlor, Plaintiff" and that "Fleming & Curti and Dunham… not only breach their duty as Trustees but conspire to effectuate an illegal guardianship over Defendant for which they directly benefit by charging fees."

111.    After filing the Petition, Defendant attempted to manipulate Plaintiff into a resolution, telling her he loves her and wants a relationship with his family again. Defendant sent his mother a long text message on December 23, 2024 asking to speak with her, alleging he wanted to "work things out."

112.    In his December 23, 2024 text to Plaintiff, Defendant reiterated that he wanted more money to invest in a business. He specifically texted: **"I love you and look forward to speaking with you soon. – Defendant"**

113.    Plaintiff had been burned by Defendant so many times in the past that she was not willing to further entertain his requests for financial support.

114.    Upset that his manipulative approach did not sway or trick Plaintiff into giving him any more money, on January 3, 2025, Defendant texted Plaintiff the following:

> **"You will regret everything you've done to me I promise you – this is your last chance to make things right I will not warn you again – you'll find out after the fact and I promise you will wish you had done the right thing then"**

115. Defendant followed up with his threatening message by adding the following:

    a. **"I'm going to win the case anyways and I promise that your reputation will be destroyed in the process"**

    b. **"It is not going to look good for our family if you don't care then roll the dice you will regret it"**

    c. **You need to speak with my lawyer or have your lawyer speak with mine to start the settlement process immediately or else"**

116. On March 10, 2025, the Clark County Nevada District Court dismissed the Petition filed by Defendant, finding that the 2000 Trust as amended and restated on December 9, 2020 is presumptively valid and the Court has no jurisdiction to set aside, alter or revoke the 2020 Order to Modify Trust entered by the Pima County Superior Court in Arizona.[7]

117. True to his word, following the denial of his Petition, Defendant initiated his campaign of defamatory and false allegations against Plaintiff when it became clear that she would not allow herself to succumb to extortion.

118. On April 7, 2025, Defendant physically traveled to California to drop off a letter outside of his aunt and uncle's home alleging, amongst other things, that his mother sexually abused him as a young child using wine and hypnotic techniques.

---

[7] Defendant's Motion for Reconsideration was denied on May 16, 2025.

119.    Defendant also texted screen-shot images of this same letter to his aunt, uncle and cousin the next day to ensure it would be read. He also texted these images from an unknown phone number and emailed his mother, his stepfather, and his brother (who did not receive the email due to Defendant's use of an invalid address).

120.    In this letter, Defendant claims that he also told his two paternal aunts that his mother Plaintiff allegedly abused him sexually.

121.    On April 9, 2025, Defendant appealed the denial of his Petition to the Supreme Court of the State of Nevada.  (Docket No. 90449).[8]

122.    On April 25, 2025, Plaintiff's attorney in Nevada sent Defendant a Cease-and-Desist letter, warning him to stop all defamatory communications to or about Plaintiff in any medium, including speaking directly to third parties.

123.    On April 26, 2025, after spreading false and cruel allegations about Plaintiff to extended members of their family and threatening legal action, Defendant tried a different approach to extort his mother:

> **"Mom this whole thing is getting out of hand and it's going to end badly for everyone involved what can we do to resolve this between ourselves can we have our lawyers work out some kind of settlement you never have to see or hear from me again...I know you may not care about me but can't we do what's right for my children and so we can all just move on and live our lives?"**

---

[8] Defendant's Attorney's Opening Brief filed on February 11, 2026, but stricken as non-conforming on February 12, 2026.

124.    On December 2, 2025, Defendant texted his 90-year-old maternal grandmother that he loves her and wanted to speak on the phone. She agreed to a phone call on December 3, 2025.

125.    On the December 3, 2025 phone call with his grandmother, Defendant made false allegations that Plaintiff sexually abused him as a young child.

126.    On the same phone call, Defendant told his grandmother that he intends to file suit against Plaintiff in Massachusetts, and that it will be all over the news and in the papers.

127.    During this call where he falsely alleged past sexual abuse by his mother, Defendant ranted to his grandmother about a lack of funds.  At this point in time, the Trust was paying Defendant's rent, utilities, phone, internet and groceries as well as fully supporting his three minor children. In fact, that Trust had just paid for a new 6-month lease in October 2025.

128.    It was evident to his elderly grandmother that Defendant has been unable to manage money (gambling, drugs, and giving money to associates) and was getting very desperate. Defendant's grandmother made it clear that she would not give Defendant any money. Defendant repeatedly told her, "If you love me, you'll support me." His grandmother told him not to contact her again.

**D. Defendant's Threatened Harm to His Mother's Reputation**.

129.    In January 2026, Defendant engaged legal counsel to threaten to sue his mother for alleged sexual abuse.

130.    Plaintiff is a licensed psychologist who earned her Ph.D. from Boston University in 1986. She began doing supervised clinical work in 1981; has been an independently licensed psychologist since 1987; and has been designated as a health service provider since 1993.

131.    Plaintiff has been in the field for over four decades, seen and treated hundreds of patients over the years. Retired from private practice, she continues to work part-time for a nonprofit healthcare organization facilitating groups for newly bereaved individuals and families.

132.    Through decades of practice, consultation and continuing education, she has treated many trauma survivors.

133.    Defendant's false allegations jeopardize not only Plaintiff's reputation amongst her family and friends but will tarnish the sterling professional reputation she has earned as a licensed psychologist and health service provider. These false allegations will further imperil the trust, stability and well-being of hundreds of former patients and group members who have looked to her for support and care.

134.    At all relevant times, Defendant has engaged and is engaging in a course of wrongful and extortionate misconduct by knowingly making false statements about his mother and threatening continued or expanded publication of his false statements for the improper purpose of compelling her to pay him money.

135.    Defendant has both expressly and impliedly communicated to Plaintiff that the false statements will continue, escalate, or be disseminated more broadly unless Plaintiff complies with Defendant's demands.

136.    Defendant's threats were not isolated or spontaneous but are part of a deliberate and ongoing strategy to exert leverage over Plaintiff through fear of reputational damage and humiliation.

### COUNT I

**Defamation (and Wrongful Coercive Conduct)**

137.    Plaintiff realleges and incorporates herein by reference all of the allegations set forth above.

138.    Defendant made and continues to make false and egregious statements of fact of and concerning Plaintiff.

139.    The statements are defamatory and have caused harm and will cause harm to Plaintiff's reputation.

140.    Defendant published the statements to third parties, including Plaintiff's mother and close relatives.

141.    Defendant knew the statements were false when made or acted with reckless disregard for their truth or falsity.

142.    Defendant made and published the statements for the improper and unlawful purpose of exerting pressure and leverage over Plaintiff, rather than for any legitimate communicative purpose.

143.    Defendant unlawfully threatened continued or expanded publication of the false statements unless Plaintiff complied with Defendant's demands for a monetary settlement.

144.    Defendant's conduct demonstrates actual malice and extortionate intent under applicable law.

145.    As a direct and proximate result of Defendant's actions, Plaintiff suffered reputational harm, economic damages, and severe emotional distress.

## COUNT II

### (Intentional Infliction of Emotional Distress)

146.    Plaintiff realleges and incorporates herein by reference all of the allegations set forth above.

147.    Defendant intentionally and recklessly engaged in extreme and outrageous conduct by knowingly making abhorrent and false statements and inflicting reputational harm in order to compel his mother to cave to his demands for money.

148.    Defendant intentionally disregarded the fact that such false claims would cause Plaintiff severe emotional distress.

149.    Defendant's conduct is not isolated to a singular insult or dispute, but an ongoing, years' long pattern of intimidation, manipulation and coercion purely for financial gain.

150.    Plaintiff suffered and continues to suffer severe emotional distress as a direct and proximate result of Defendant's egregious conduct.

151.    Defendant's actions constituted a sustained course of conduct involving false accusations, reputational threats, and coercive demands, rather than a single disagreement or momentary lapse of judgment.

152.    Defendant knew or reasonably should have known that this pattern of conduct would cause Plaintiff severe emotional distress, including anxiety, humiliation, fear, and loss of personal and professional security.

153.    Plaintiff in fact suffered severe emotional distress as a direct and foreseeable result of Defendant's conduct. As a further result of Defendant's actions, Plaintiff suffered damage to reputation, standing in the community, and economic interests.

## **JURY DEMAND**

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL CLAIMS AND ISSUES.**

WHEREFORE, Plaintiff prays that this Honorable Court:

a.  enter judgment in the amounts awarded by the jury in her favor on Counts I and II;

b.  award all damages permitted by law, plus interest at the rate of 12% per annum from

the date of this Complaint, plus costs and attorneys' fees; and

c.  grant such other and further relief as this Court deems just and appropriate.

Respectfully Submitted,

JANE DOE,

By her attorneys,

Howard M. Cooper (BBO# 543842)
*hcooper@toddweld.com*
Christine R. Thompson (BBO# 667806)
*cthompson@toddweld.com*
Sandy N. Eid (BBO# 707141)
*seid@toddweld.com*
TODD & WELD LLP
One Federal Street, 27th Floor
Boston, MA 02110
Tel: (617) 720-2626
Fax: (617) 227-5777

Dated: February 25, 2026

FILED
ESSEX SUPERIOR COURT
2026 FEB 26 A 2: 17